1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10   DOMINGA G. SOTO,                    Case No.: 2:22-cv-03607-AB-RAO

11                        Plaintiffs,    **FINDINGS OF FACT AND**
                                         **CONCLUSIONS OF LAW AFTER**
12                                       **BENCH TRIAL**
          v.
13

14   UNITED STATES OF AMERICA,

15                        Defendant.

16

17          Plaintiff Dominga G. Soto ("Plaintiff") and Defendant United States of America

18   ("Defendant") appeared for a bench trial on July 11-13, 2023. The parties filed their

19   proposed Findings of Fact and Conclusions of Law. *See* Dkt. Nos. 80, 82.[1] Pursuant to

20   Fed. R. Civ. P. 52, the Court renders its Findings of Fact and Conclusions of Law.

21   **I.    BACKGROUND**

22          Plaintiff Dominga G. Soto ("Plaintiff") brings this Federal Tort Claims Act

23   ("FTCA") negligence action concerning a parcel that was delivered to her home on

24

25   ───────────────

26   [1] The Transcripts are at Dkt. Nos. 85-87. Defendant cites the transcripts as Tr. 1, Tr. 2,
     and Tr. 3. Plaintiff's citations are to the witness's testimony, e.g., "D. Soto Tr. Test."
27   The Court maintains the parties' differing citation conventions. Defendant's
     objections (Dkt. No. 84) that certain exhibits were not admitted into evidence are
28   overruled as moot because the Court has not relied on those exhibits.

                                          1

April 24, 2021 by United States Postal Service ("USPS") Letter Carrier Felipe Carrillo. *See* Final Pretrial Conference Order ("FPTCO," Dkt. No. 71), Admitted Fact ("AF") No. 12 ("The incident occurred on April 24, 2021.").

The basic facts concerning the incident are not in dispute. In brief, on April 24, 2021, Plaintiff stepped out her front door and slipped on a hard, cylinder-shaped package that Mr. Carillo delivered to her doorstep. Plaintiff fell and suffered injuries to her back. Plaintiff alleges that Mr. Carillo was negligent in placing the package where he did. Defendant denies that Mr. Carillo was negligent.

Regarding damages, Plaintiff seeks compensation for past and future medical expenses, and past and future non-economic damages. The parties agree that Plaintiff's fall caused her to suffer L2 and L1 compression fractures, and they agree that Defendant's expert's testimony established the reasonable value of her past medical treatment. What the parties *do* dispute is whether Plaintiff's fall worsened her existing L4-L5 spondylolisthesis, stenosis, and facet cyst, the value of future treatment for those conditions, and non-economic damages.

The Court first addresses liability, then damages.

Any finding of fact deemed to be a conclusion of law is hereby incorporated into the Conclusions of Law.

Any conclusion of law deemed to be a finding of fact is hereby incorporated into the Findings of Fact.

## II.  FINDINGS OF FACT RELATING TO LIABILITY

### A. Background Regarding Plaintiff's House and Deliveries There

1.      Plaintiff has lived at her House since 1972. FPTCO AF No. 5; Tr. 1 at 37:15-17.

2.      Plaintiff has continuously had parcels delivered to Plaintiff's House since 1972. FPTCO AF No. 7).

3.      Plaintiff's House is set back from the public sidewalk by a walkway. Ex. 2 (IMG_0431.MOV).

4.     Plaintiff's House has a covered front porch that is one step down from the home. Tr. 1 at 60:11-13; Ex. 2 (IMG_0433.MOV) at 0:17.



5.     Plaintiff's son, Ross Dale Soto, has lived at Plaintiff's House since at least 2013. FPTCO AF No. 6.

6.     Mr. Soto has a lot of package deliveries made to Plaintiff's House. FPTCO AF No. 8 ("Ross Dale Soto has a lot of deliveries made to Plaintiff's House."); Tr. 1 at 49:4-6, 127:14-16, 129:3-6.

7.     Plaintiff knew that her son had a lot of deliveries made to Plaintiff's House. Tr. 1 at 49:4-6 ("Q. Your son who lives with you, he has a lot of deliveries made to your house; right? A. Yes.").

8.     Mr. Soto has regularly had guitar strings delivered to Plaintiff's House. FPTCO AF No. 9 ("Ross Dale Soto has regularly had guitar strings delivered to Plaintiff's House.").

9.     Every time Mr. Soto ordered guitar strings, they were delivered to Plaintiff's House in a tube-shaped parcel. FPTCO AF No. 10 ("Every time Ross Dale Soto ordered guitar strings, they were delivered to Plaintiff's House in a circular tube."); Tr. 1 at 52:8-16 ("QUESTION: Okay. And in terms of the tube, the package, the tube-like package, has your son ever previously ordered strings or anything that

would be delivered in sort of like that tube-like package to your house? "ANSWER: Yeah, he orders a lot of stuff, but the tubes all -- always comes – ***the strings always comes in the tubes like that***.") (emphasis added).

10.   Mr. Soto sometimes told Plaintiff that deliveries were coming to Plaintiff's House, and sometimes he did not. Tr. 1 at 129:7-13.

11.   Plaintiff knew that parcels were sometimes delivered to her House without the delivery person first knocking on her door or ringing her doorbell. Tr. 1 at 53:13-24, 54:9-12.

**B. The April 24, 2021 Parcel Delivery to Plaintiff's House and Plaintiff's Fall**

12.   On April 24, 2021, Mr. Carrillo delivered a parcel addressed to Mr. Soto to the covered porch of Plaintiff's House. *See* FPTCO, p. 4 (Admitted Fact No. 3).

13.   Ms. Soto sometimes knows that a package is left at her door because the mail-carriers sometimes either ring the doorbell or her son notifies her of a delivered package. (D. Soto Tr. Test. 53:13-54:3; R. Soto Tr. Test. 129:3-13).

14.   Mr. Soto expected that his package would be delivered to Plaintiff's House on April 24, 2021. Tr. 129:14-17 ("Q. Specifically on April 24th, 2021, you were expecting a package to be delivered to your house; right? A. Yes.").

15.   Mr. Soto did not tell Plaintiff that a parcel was to be delivered to Plaintiff's House on April 24, 2021. Tr. 129:18-20 ("Q. But you didn't tell your mother that there was going to be a package delivered [on April 24, 2021], did you? A. Not for that one, no.").

16.   The parcel was cylindrical (tube-shaped) and hard, and did not require a signature for delivery. *See* FPTCO AF No. 11 ("The parcel delivered to Plaintiff's House in a circular tube on April 24, 2021 did not require a signature for delivery.").

17.   The parcel delivered to Plaintiff's House on April 24, 2021, was not subject to any special instructions regarding its delivery. Tr. 1 at 159:6-8.

18.   Mr. Carrillo's delivery of the parcel and Plaintiff's fall were captured by a security camera at the House.  (Trial Exhibits 2 and 502-59-61; Bonafilia Tr. Test.

4

75:10-16; 85:8-86:9; 87:13-21; 90:6-20; 91:4-11; 92:15-23; 101:4-17.)

19.     The video footage shows that at about 2:31 p.m., Mr. Carillo dropped the parcel onto Plaintiff's doorstep. The package came to rest a short distance—the Court estimates 8-12"—from the threshold of Plaintiff's door. Mr. Carillo did not knock on the door, ring the doorbell, or attempt delivery to Plaintiff at her door (Trial Exhibit 2; Trial Exhibit 502:59-61; Carrillo Tr. Test. 186:11-19; Bonafilia Tr. Test. 75:10-16; 85:8-86:9; 87:13-21; 90:6-20; 91:4-11; 92:15-23; 101:4-17.)

20.     Mr. Carillo, who has been a letter carrier since 2009, testified to the effect that he delivered the package consistent with his training and with his pattern and practice, and that he has never been involved in another incident in which someone slipped and fell over a package he delivered. Tr. 1 at 152:22-182:15.

21.     After the parcel had been delivered, Plaintiff decided to exit her house to check for the mail delivered that day. Tr. 1 at 60:1-5.

22.     At about 4:31 p.m., Plaintiff opened the front door, paused about four seconds, and then stepped down onto her front porch with her right foot. (Trial Exhibit 2.) Plaintiff did this while looking straight at her mailbox, and without looking down. Tr. 1 at 60:8-10 ("Q. So when you went to get the mail, you opened your front screen door? A. Yes."); Tr. 1 at 61:14-62:5 (Q. "So when you opened the door, you paused a few seconds before your foot crossed your front door; right? A. Yes, uh-huh. Q. You then stepped down towards your front porch? A. Yes. Q. You don't remember ever looking down at any point while you put your foot down onto where you felt the front porch was; right? A. I didn't look down …. Q. But you didn't look down; right? A. Uh-uh. Q. That's because you were looking straight to the mailbox because you were stepping out of your front door to get the mail? A. Right."); *see also* Ex. 2 (IMG_0431.MOV).

23.     Plaintiff did not look down at her feet as she stepped down, but rather kept her eyes looking straight at her mailbox. Tr. 1 at 61:20-62:5 ("Q. You don't remember ever looking down at any point while you put your foot down onto where

you felt the front porch was; right? A. I didn't look down …. Q. But you didn't look down; right? A. Uh-uh. Q. That's because you were looking straight to the mailbox because you were stepping out of your front door to get the mail? A. Right.").

24.    As Plaintiff was lowering her right foot down to the porch, she stepped on the cylindrical package that Mr. Carillo had delivered, slipped on the package, and fell. Tr. 1 at 62:6-7.

25.    After falling, Plaintiff stood up without assistance. Tr. 1 at 62:8-9, 13-14.

26.    Plaintiff then bent down and picked up the package. Tr. 1 at 63:13-20 ("A. … I picked up the package when I fell down. Q. But you went outside, you bent down and you picked up the package? A. Yes. Q. Bending down to pick up the package was not a slow process; right? A. Yes.").

27.    Plaintiff went inside her house and remained standing until her friend came over to her house. Tr. 1 at 62:10-63:1.

28.    Plaintiff did not go the emergency room on April 24, 2021. FPTCO AF No. 13).

29.    Plaintiff went to her son's house for dinner that evening. Tr. 1 at 64:1-3.

30.    Plaintiff did not seek any medical treatment until April 25, 2021. *See* FPTCO AF No. 13 ("Plaintiff did not go to the emergency room on April 24, 2021.").

31.    Mr. Carillo testified that he had other options for delivering the package that would not have delayed his delivery time or require additional effort. Some of those include knocking the door, ringing the doorbell, or placing the package against the wall, or to the left or right side of the door. (Trial Exhibits 502-59-61 and 502-89; Bonafilia Tr. Test. 85:8-87:22 Carrillo Tr. Test. 182:10-15; 184:9-22.)

32.    Mr. Carillo agreed that it was possible to slip and fall from a cylinder tube-shaped package. (Carrillo Tr. Test. 164:22-165:2.)

**C. USPS's Rules Governing Parcel Delivery**

33.    USPS policy required a USPS Letter Carrier to deliver a parcel to a "secure" location, meaning a location that minimizes risk of theft or weather damage.

6

Tr. 1 at 196:13-197:6; Tr. 1 at 197:7-17; Tr. 1 at 196:13-197:17.

34.    USPS's M-41 Handbook section 322.311 instructs that "unless [a parcel] has … specific endorsements" reflecting that "the customer states at the time of shipping that they require signature [because the parcel is] restricted – [or] if it's a C.O.D. [cash-on-delivery], … or if it's a registered [delivery]" then "you're allowed to leave the package without getting a signature or requiring anybody to receive it" and that "uninsured packages or packages that to do not require a signature may be left in an unprotected location, such as a stairway, uncovered porch." Tr. 1 at 204:3-23.

35.    "[T]he Carrier Release Program is pretty much anything that doesn't require a signature." Tr. 1 at 206:3-4.

36.    The mailer of the parcel delivered on April 24, 2021 to Plaintiff's House participated in the Carrier Release Program. Tr. 1 at 206:16-18.

37.    No USPS policy or handbook required a USPS Letter Carrier to knock or ring a doorbell before attempting to deliver a package to a residential customer. Tr. 1 at 202:10-11, 15; Tr. 1 at 204:3-205:2; *see also*, Tr. 1 at 196:13-197:6; Tr. 1 at 197:18-198:2; Tr. 1 at 155:5-9.

38.    No USPS rule or handbook required a USPS Letter Carrier to deliver a parcel to a particular location at a single-family residential customer's residence. Tr. 1 at 102:13-18; Tr. 1 at 102:21-24 ("Q. And just to reiterate, there is no USPS policy that regulates where a customer's package is placed on the porch? A. [Mr. Bonafilia:] Correct.").

39.    In 2021, USPS's M-41 Handbook Section 631's requirements only applied to "parcel routes." *See* Tr. 210:20-211:18 (Postmaster Garcia explaining Ex. 502-89's (M-41 Section 631's) requirements regarding delivery of parcels relate to "a route that's considered a parcel route" which is different from "a regular mail carrier route that delivers mail and parcels").

40.    In 2021 Route 3, the route Plaintiff's House was on, was a route on which both mail and parcels were delivered. Therefore, it was not a "parcel route" and

1    M-41 Handbook Section 631 did not apply. Tr. 1 at 210:20-211:21.

2        41.    "Special instruction" is when the customer tells USPS how they want

3    carriers to deliver parcels. Tr. 1 at 157:15-18. Customers give USPS Letter Carriers

4    special instructions to ensure their parcels are not stolen or damaged by weather. Tr. 1

5    at 157:19-22.

6        42.    In 2021, a customer had three different ways to give USPS special

7    instructions: (1) talk to the carrier, (2) contact the post office, or (3) send the special

8    instructions online. Tr. 1 at 158:5-16.

9        43.    The parcel delivered to Plaintiff's House on April 24, 2021, was not

10   subject to any special instructions regarding its delivery. Tr. 1 at 159:6-8.

11       44.    USPS permitted Mr. Carrillo to deliver the parcel to Plaintiff's House

12   without first knocking or ringing the doorbell to attempt delivery. Tr. 1 at 198:20-

13   199:5.

14       45.    Mr. Carrillo's delivery of the parcel did not violate any USPS policy or

15   regulation. Tr. 1 at 198:20-199:5; Tr. 1 at 102:13-18 ("QUESTION: Is there any other

16   wrongful act? '[Plaintiff's Expert Mr. Bonafilia's] ANSWER: Nothing that I would be

17   able to give to you in writing under a postal regulation. There is nothing in the

18   regulations that states where a parcel should be placed on a porch.").

19   **III.    CONCLUSIONS OF LAW RELATING TO LIABILITY**

20       **A. Applicable Legal Standards**

21       46.    Under the Federal Torts Claims Act ("FTCA"), the United States has

22   only waived its sovereign immunity for liability under circumstances where a private

23   person would be liable in accordance with the law of the place where the act or

24   omission occurred. 28 U.S.C. § 1346(b)(1).

25       47.    Cases brought under the FTCA are governed by the "law of the place

26   where the act or omission occurred."  28 U.S.C. § 1346(b).

27       48.    Plaintiff bears the burden of proving her claims by a preponderance of

28   the evidence. *Jackson v. Ryder Truck Rental, Inc.* 16 Cal. App. 4th 1830, 1837 (1993).

49.     The elements of a cause of action for negligence are: "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c)the breach as the proximate or legal cause of the resulting injury." *Id.*

50.     "Breach is the failure to meet the standard of care." *Coyle v. Historic Mission Inn Corp.* 24 Cal.App.5th 627, 643 (2018).

51.     "The element of causation requires there to be a connection between the defendant's breach and the plaintiff's injury." *Id*. 645.

52.     "[E]very person has a right to presume that every other person will perform his duty and obey the law and in the absence of reasonable grounds to think otherwise, it is not negligence to assume that he is not exposed to danger which could come to him only from violation of law or duty by such other person." *Celli v. Sports Car Club of America, Inc.* 29 Cal.App.3d 511, 523 (1972).

53.     The Court must determine as a matter of law the standard of care that applies to the delivery of parcels. *Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 546 (1993). "In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances." *Ramirez v. Plough, Inc.*, 6 Cal.4th 539, 546 (1993). The parties appear to agree, and the Court determines, that the duty of care applicable here is the general is to use reasonable care to prevent harm to oneself or to others. CACI 401 (Sept. 2003, Rev. 2020). See Def. Prop. F. of F No. 50.

54.     A plaintiff's damages must be reduced by the percentage of her responsibility if: (a) the plaintiff was negligent; and (b) the plaintiff's negligence was a substantial factor in causing her harm. CACI 405 (Dec. 2009) (Comparative Fault of Plaintiff).

55.     A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. Conduct is not a substantial factor in causing harm if the same harm would have occurred without that

9

conduct. CACI 430.

**B. Mr. Carillo and Plaintiff Were Both Negligent**

56.     The evidence establishes that Mr. Carillo was negligent in placing the cylindrical package on Plaintiff's doorstep the way he did. Defendant argues that Mr. Carillo was not negligent because he delivered the package consistent with USPS's carrier release program, which does not require him to either knock a door or ring a doorbell before leaving a package at a recipient's address. Indeed, Defendant points to cases applying a risk-utility analysis acknowledging that the social benefit of such carrier release programs is substantial and tends to outweigh the risk of a recipient tripping over an unannounced package left at a door. *See, e.g., Galullo v. Fed. Exp. Corp.*, 937 F. Supp. 392, 393 n. 1, 394, 400 (E.D. Pa. 1996), *Schell v. United Parcel Serv.*, 61 Ohio Misc. 2d 421, 423, 425, 427-28 (Com. Pl. 1989).

57.     But Mr. Carillo's duty was not limited to his employer's delivery standards. *Cf. Ramirez v. Plough, Inc.*, 6 Cal.4th 539, 548 (1993) ("Where a statute, ordinance or regulation is found to define a standard of conduct for the purposes of negligence actions, ... the standard defined is normally *a minimum standard*, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them.") (citing Rest.2d Torts § 288C) (emphasis added).

58.     As Defendant itself agrees, the ordinary standard of care applies. In determining whether Mr. Carillo breached the ordinary standard of care, the Court has *considered* that Mr. Carillo complied with USPS's carrier release program and its delivery standards, and that he delivered the package consistent with his custom and practice, but these facts are not determinative because Mr. Carillo nevertheless exposed Plaintiff to a foreseeable, unreasonable risk. The Court finds that dropping the hard cylindrical package on Plaintiff's doorstep, and leaving it where it came to rest on Plaintiff's doormat just beyond the threshold of her door, created a foreseeable

slip or trip hazard for Plaintiff. That the parcel was hard and cylindrical-shaped made it more of a hazard than other shaped packages would be. Given this, the tripping hazard was foreseeable.

59.     The Court also finds that this hazard posed an unreasonably high risk, given that there were alternative, less hazardous locations on the doorstep where Mr. Carillo could have readily left the package. Mr. Carillo testified that there were such alternatives and that they would not have delayed him. For example, Mr. Carillo could have leaned the package against the wall under the mailbox or on either side of the door, or he could have placed it in the rack attached to the bottom of the mailbox. None of these alternatives would have presented a significant tripping hazard.

60.     The Court also finds that Mr. Carillo's negligence caused Plaintiff harm: Plaintiff fell onto her porch, injuring her back. The Court will determine the extent of the injuries in the next section.

61.     The evidence adduced at trial shows that Plaintiff was *also* negligent and that her negligence was a substantial factor in causing her harm. CACI 405 (Dec. 2009).

62.     Plaintiff shares fault because she did not look down before stepping down onto the porch. Plaintiff knew that she had to step down from the doorway onto the front porch when she exits; that packages were sometimes left on her porch; and that delivery persons did not always knock on her door or ring her doorbell when delivering parcels. Plaintiff was also going to check the mail. That there could be a package on the porch, and that it could pose a tripping hazard, was therefore foreseeable to Plaintiff. Despite this, and despite pausing for a few seconds before stepping down, Plaintiff did not look down to where she was stepping. Plaintiff's failure to look down was unreasonable and was a substantial factor in causing her harm. Had Plaintiff looked down, she may have seen the parcel and not stepped on it.

63.     The Court finds that Mr. Carillo is 20% at fault, and Plaintiff is 80% at fault.

**IV.     FINDINGS OF FACT RELATING TO DAMAGES**

   **A. Plaintiff's L2 and L2 Compression Fractures Were Caused by the Fall.**

64.     The parties agree, and the Court concludes, that Plaintiff's April 24, 2021 fall caused compression fractures of Plaintiff's L2 and L1 vertebrae.

65.     Plaintiff's April 24, 2021 fall caused a mild compression fracture of Plaintiff's L2 vertebra. Tr. 2 at 8:16-18; Tr. 2 at 56:17-19; Tr. 2 at 73 13-15; Ex. 528-3A.

66.     On May 21, 2021, Plaintiff underwent an L2 kyphoplasty. FPTCO AF No. 14.

67.     Plaintiff's L2 kyphoplasty surgery caused a mild compression fracture of her adjacent L1. Tr. 2 at 22:21-23:4; Tr. 2 at 79:15-21; Tr. 2 at 84:2-12.

68.     On June 14, 2021, Plaintiff underwent an L1 kyphoplasty procedure. FPTCO No. 15.

69.     Plaintiff also received physical therapy for her L2 and L1 mild compression fractures. Tr. 1 at 1337:21-22.

70.     Plaintiff's February 1, 2022 MRI report reflected "resolution of the associative bone marrow edema since prior study" and "significant improvement" which means, "[i]n other words, [her L1] fracture ha[d] basically healed" as of February 1, 2022. Tr. 2 at 120:24-121:4, 121:20-22, 122:9-13.

71.     Plaintiff's February 1, 2022 MRI report similarly showed the "same thing" as to her L2 fracture, "basically they're healed, both levels" as of February 1, 2022. Tr. 2 at 120:24-121:4, 122:14-17.

72.     Because Plaintiff's L2 and L1 fractures have "totally healed," she does not require any additional treatment to address them. Tr.125:24-126:2 ("Q. Is there any additional treatment needed to address plaintiff's L2 or L1 fractures? [Defendant's Expert Dr. Rudin] A. No, those are totally healed. Those are done.").

73.     Based on an October 19, 2022 encounter, Plaintiff's treating physician, Dr. Yuan, concluded that because Plaintiff's May 2022 epidural injection gave her

"about 3 weeks of relief of pain, mainly her back pain, but not her leg pain," that her "[n]eck and upper back pain [was] likely muscular in nature." Ex. 551-3. Dr. Yuan further noted that Plaintiff's other back and lower extremity pain was in a setting of degenerative spondylolisthesis and spinal stenosis. *Id.*

74.     Plaintiff and other witnesses testified as to Plaintiff's non-economic damages caused by the L2-L1 fractures and the kyphoplasties. On the day of the fall, Plaintiff was in pain, attempted to go to her son's house for dinner but had to leave due to the pain. Tr. 1, 64:10-21. The next day, Plaintiff went to the emergency room, and was diagnosed with the L2 compression fracture. Plaintiff had her L2 kyphoplasty on May 21, 2023, about 4 weeks after the fall, and during this time she was in pain, could only lay in bed, had trouble moving and getting out of bed, and her son had to lift her and help with using the bathroom. Tr. 1, 134:16-137:19. The L2 kyphoplasty caused a compression fracture in the L1 vertebra, and Plaintiff had another kyphoplasty to repair it about 3 weeks later, on June 14, 2023. Plaintiff healed by February 1, 2022. All this time, Plaintiff experienced the same pain and suffering, and loss of enjoyment of life, and embarrassment from needing her son to take care of her. Tr. 1, 44:1-10. Plaintiff used to go dancing with friends several times week, but couldn't do that the same anymore. Tr. 1, 106:20-108:7. Plaintiff's two kyphoplasties caused anxiety, bodily invasion, and disfigurement (scars). Tr. 1., 45:23-46:12, Ex. 3.

75.     The parties agree that Defendant's billing expert, Lindsay Knutson, established the reasonable value of Plaintiff's past medical treatment. On the stand, Ms. Knutson testified that the bills added up to $27,216.96, but it is apparent she made a mathematical error and the correct amount is $22,721.96.

**C. Plaintiff's Pre-Existing Spondyolisthesis, Stenosis, and Facet Cyst**

76.     Since at least 2015, Plaintiff had a pre-existing L4-5 spondylolisthesis. Tr. 2 at 36:22-24 ("Q. You would agree that Ms. Soto had L4-5 spondylolisthesis since at least 2015; correct? [Plaintiff's Expert Dr. Nourian] A. I believe so."); Tr. 2 at 56:22-25 (Defendant's Expert Dr. Rudin: "She also had a history of spondylolisthesis

at L4-5, which is the shifting of the bones, and that did not appear to have changed at all from the -- or after the fall."); Tr. 2 at 59:8-11 ("Q. Did plaintiff have a history of any diagnosed medical conditions? [Defendant's Expert Dr. Rudin] A. Well, she had a history of spondylolisthesis at L4-5 ...."); Tr. 2 at 85:23-86:1.

77.    The severity of spondylolisthesis is usually graded from zero to five. Tr. 2 at 86:14-18.

78.    Plaintiff's pre-existing L4-5 spondylolisthesis was a degenerative condition, which "means basically chronic wear and tear" caused Plaintiff's spondylolisthesis. Tr. 2 at 85:24-3, 93:2-13, 93:19-94:3; *see also*, Ex. 15-990 (03/20/18 Plaintiff's CT scan report reflecting "IMPRESSION: .... 2. Grade 1 degenerative anterior spondylolisthesis of L4 on L5."); Ex. 547-2 (11/09/20 MRI Report reflecting "IMPRESSION: ... 3. Grade 1 degenerative anterior listhesis at L4-5.").

79.    CT scans and MRIs of Plaintiff's spine indicate that: on July 17, 2016, Plaintiff's L4-5 spondylolisthesis was approximately 10%. Tr. 2 at 87:14-24; Ex. 522-1A (07/17/16 CT scan); on March 20, 2018, Plaintiff's L4-5 spondylolisthesis was approximately 16%. Tr. 2 at 90:1-11, 92:16-20; Ex. 524-1A (03/20/18 CT scan); on July 29, 2019, Plaintiff's L4-5 spondylolisthesis was approximately 20%. Tr. 2 at 95:4-16; Ex. 525-1A. (07/29/19 CT scan); on November 9, 2020 Plaintiff's L4-5 spondylolisthesis was approximately 21-22%. Tr. 2 at 99:2-13; Ex. 532-1A (11/09/20 MRI film).

80.    Prior to her fall on April 24, 2021, Plaintiff's physician reviewed her November 9, 2020 MRI with her, including her lumbar spine illness and the fact that she had a "Grade 1 degenerative anterior listhesis at L4[-]5." Ex. 11-5.

81.    Following Plaintiff's April 24, 2021 fall, her L4-5 spondylolisthesis did not worsen in severity; instead, it remained stable. Tr. 2 at 103:5-18 (severity of spondylolisthesis in May 2, 2021 CT scan (Ex. 528-2A) "essentially" the same as severity of spondylolisthesis in November 9, 2020 MRI film image (Ex. 532-1A)); Tr.

2 at 103:19-23 ("[T]he November 2020 MRI and [the May 2021] CT scan really haven't changed at all in terms of the overlap" of Plaintiff's L4-5 degenerative spondylolisthesis.).

82.    On May 2, 2021, Plaintiff's L4-5 spondylolisthesis was approximately 21%. Tr. 2 at 103:5-18; Ex. 528-2A (05/02/21 CT scan).

83.    On May 27, 2021, after Plaintiff's May 21, 2021 kyphoplasty, Plaintiff's L4-5 spondylolisthesis was approximately 20%, which is roughly the same as before her accident, showing no change in its severity. Tr. 2 at 105:5-16; Tr. 2 at 105:17-20; Ex. 519-3A (05/27/21 X-ray showing Plaintiff's L4-5 spondylolisthesis with as less than approximately 20% overlap); *cf. with* Ex. 528-2A (05/02/21 CT scan); *and* 532-1A (11/09/20 MRI).

84.    On October 6, 2022 Plaintiff's L4-5 spondylolisthesis was still approximately 21%. Tr. 2 at 107:10-17; Ex. 529-1A (10/06/22 CT scan).

85.    The scans for 2016, 2018, 2019, 2021 and 2022, show that Plaintiff "had [L4-5] spondylolisthesis as far back as 2016, and it progressed pretty significantly until about 2020 and seemed to stabilize, and now it's sort of fixed at about 21 percent of overlap." Tr. 2 at 108:2-9.

86.    Plaintiff's medical records show that her L4-5 spondylolisthesis and stenosis were not asymptomatic before her April 2021 fall, because she had been complaining of their symptoms to her physicians. Tr. 2 at 70:3-7 ("Q. In your medical opinion, was Ms. Soto's spondylolisthesis … and stenosis asymptomatic until April 2021? [Defendant's Expert Dr. Rudin] A. No. It's in the medical record that she's been complaining of it.").

87.    In a physician visit on December 5, 2014, Plaintiff reported that she had back pain due to cold weather. Ex. 10-137.

88.    On June 15, 2015, Plaintiff complained to her physician of "generalized aches and pain *from back to legs*." Ex. 10-133 (emphasis added).

89.    On May 12, 2017, Plaintiff told her physician she was having "arthritis"

in her "neck, [and] legs", and that the pain was "worse in the morning" but "improve[d] as she start[ed] moving and walking." Ex. 10-118 (05/12/2017 Medical Record reflecting "SUBJECTIVE … C/o arthritis on neck, legs.").

90.   On May 6, 2020, Plaintiff reported to her physician that she had ongoing right leg pain since the day before. Ex. 10-81 (05/06/20 Medical Record reflecting "SUBJECTIVE … [Plaintiff] does report R leg pain since yesterday.").

91.   On October 27, 2020, Plaintiff presented to her physician "for consultation *on [her] lumbar spine pain*" and told her doctor that "[s]he *ha[d] been having pain for about 4 years"* that was not the result of an "*injury or accident*" and "that her pain *is across the lower back and radiates down the right leg.*" Ex. 11-2 (emphasis added).

92.   During that same October 27, 2020 visit that Plaintiff reported "[r]adiculopathy [in her] lumbar region," Plaintiff's spine was examined and her L5-S1 disc was documented as "abnormal" because it was "narrow." Exs. 11-3 and 11-4 (10/27/20 Medical Record).

93.   The pain that was radiating down Plaintiff's leg from her lumbar spine and that she reported to her physicians on October 27, 2020, is "from her stenosis. In other words, she has tightness of the nerves and that causes radiating leg pain." Tr. 2 at 67:12-16.

94.   On November 9, 2020, Plaintiff "report[ed] *low back pain* down the left buttock, hip and leg *for 6 months.*" Ex. 11-8 (emphasis added).

95.   On November 9, 2020 Plaintiff's reported pain was assessed as "Radiculopathy, lumbar region" and the physician requested authorization to refer Plaintiff to "Pain Management for epidural injections." Ex. 11-5 and Ex. 11-7 (11/20/20 MRI Report).

96.   The type of pain Plaintiff reported on November 9, 2020 is the kind of pain typically associated with stenosis and or spondylolisthesis. Tr. 2 at 69:5-13; Tr. 2 at 69:14-21.

97.     On October 19, 2022, Plaintiff's treating physician, Dr. Yuan, concluded that because Plaintiff's May 2022 epidural injection gave her "about 3 weeks of relief of pain, mainly her back pain, but not her leg pain," that her continuing "back, buttock, and left lower extremity pain and sciatica" was caused by her "degenerative spondylolisthesis and severe spinal stenosis …." Ex. 551-3.

98.     There is no evidence that Plaintiff's pre-existing L4-5 Facet Cyst was exacerbated by her April 2021 fall.

**D. The Expert Testimony Regarding Plaintiff's Spondyolisthesis, Stenosis, and Facet Cyst**

99.     Defendant's expert Dr. Rudin testified that Plaintiff's April 24, 2021 fall <u>did not</u> exacerbate Plaintiff's pre-existing L4-5 spondylolisthesis. Tr. 2 at 108:10-13 ("Q. Was [Plaintiff's L4-5 spondylolisthesis] exaggerated by her fall on April 24th, 2021? [Defendant's Expert Dr. Rudin] A. There's no radiographic evidence that it got worse after the fall, no."); Tr. 2 at 125:4-15 (Defendant's Expert Dr. Rudin: "It didn't have any affect on the L4-5 spondylolisthesis whatsoever.").

100.    Defendant's expert Dr. Rudin testified that Plaintiff's L2 or L1 fractures <u>could not</u> cause her L4-5 spondylolisthesis or the pain associated with that condition to worsen. Tr. 2 at 122:18-21 ("Q. Could a fracture in Ms. Soto's L1 or L2 have caused her L4-5 spondylolisthesis or the pain associated with that condition to worsen? [Defendant's Expert Dr. Rudin] A. No.").

101.    Defendant's expert Dr. Rudin testified that Plaintiff's L2 and L1 kyphoplasty surgeries <u>did not</u> exacerbate Plaintiff's pre-existing L4-5 degenerative spondylolisthesis. Tr. 2 at 108:14-16 ("Q. Was it exaggerated or exacerbated by either of her kyphoplasties? [Defendant's Expert Dr. Rudin] A. Again, no, it hasn't changed.").

102.    Defendant's expert Dr. Rudin testified that Plaintiff's L2 and L1 kyphoplasty surgeries <u>could not</u> cause her L4-5 spondylolisthesis or the pain associated with that condition to worsen because the L2 and L1 are "too far away"

17

from the L4-5 such that "[t]hey wouldn't affect each other." Tr. 2 at 123:22-123:1 ("Q. Could [Plaintiff's] kyphoplasties have caused her L4-5 spondylolisthesis or her pain from that condition to worsen? [Defendant's Expert Dr. Rudin] A. No. Those are too far away. They wouldn't affect each other."); *see also* Tr. 2 at 123:2-7 ("Q. What do you mean too far away? A. Well, L4-5 and L2 are about two to three inches away. They're dissociated. You know, there's the L3-4 level in between the L2-3 level in between, and they just wouldn't have any relationship.").

103.   Plaintiff's Expert Dr. Nourian opined that Plaintiff had a moderate stenosis prior to the fall because the November 9, 2020 MRI report states that she had "[m]oderate bilateral neural foraminal stenosis." Tr. 2 at 36:25-37:8; Ex. 547-2 (11/09/20 MRI Report).

104.   In forming that opinion, Dr. Nourian relied solely on the written report that another doctor had prepared regarding the November 9, 2020 MRI film, and did not review the MRI film to make an independent determination of the severity of Plaintiff's stenosis. Tr. 2 at 36:25-37:2; Tr. 2 at 42:13-16 (Dr. Nourian relied on "summar[y of the 11/09/20 MRI] in Dr. Chambers' report.").[2]

105.   Plaintiff's Expert Dr. Nourian admits that "[i]t's possible" that absent any trauma, such as a fall or other accident, Plaintiff's stenosis could have turned from moderate to severe stenosis. Tr. 2 at 38:4-11; *see also* Tr. 2 at 38:23-39:1, 39:5-10.

106.   Defendant's Expert Dr. Rudin's opinion that Plaintiff's April 24, 2021 fall did not exacerbate Plaintiff's pre-existing L4-5 spondylolisthesis or stenosis is persuasive and reliable because Dr. Rudin reviewed all available medical records,

---

[2] While at trial Plaintiff's Expert Dr. Nourian claimed that he reviewed "the [MRI] film as well" (Tr. 2 at 37:3-4), that assertion is not supported by the record. It was Dr. Nourian's practice to list an image and the resulting report as separate items he reviewed, just as he did for the October 27, 2020 X-ray and Dr. Chambers' resulting written report for that X-ray. Tr. 2 at 43:21-44:2. But Dr. Nourian's report did not list the November 9, 2020 MRI film separately from the November 9, 2020 report, indicating that he only reviewed the report.

including the only MRI film, all of Dr. Yuan's records and X-rays, and the complete
set of Plaintiff's medical history reflecting her historical reports of pre-existing back
pain, including her lower back pain and pain radiating down her back and legs.

107.   Plaintiff's Expert Dr. Nourian's opinion that Plaintiff's pre-existing L4-5
degenerative spondylolisthesis and stenosis were asymptomatic before her accident
and only became symptomatic because of her April 24, 2021 fall is not persuasive
given Plaintiff's medical records showing that, since about 2014, Plaintiff had
consistent complained of pain that was diagnosed as spondylolisthesis. In addition,
Dr. Nourian did not review: (i) the two X-rays taken by Plaintiff's treating physician,
Dr. Yuan (Tr. 2 at 41:8-16); (ii) the X-rays taken of Plaintiff's cervical and thoracic
spine from Memorial Orthopedic Surgery Group (Tr. 2 at 41:20-25; 42:2-5); (iii) the
MRI film from Downey MRI (Tr. 2 at 42:13-18); and (iv) the only MRI film produced
in this case, the November 9, 2020 MRI film (see Ex. 532-1) instead relying on
another doctor's reported interpretation of the severity of Plaintiff's L4-5 stenosis.

108.   Plaintiff's Expert Dr. Nourian did not conduct an independent analysis of
Plaintiff's L4-5 conditions to reach his opinion.

109.   Dr. Nourian did not meaningfully consider potential alternative causes
for Plaintiff's pain after the fall, including: (1) Dr. Yuan's opinion that Plaintiff's pre-
existing L4-5 spondylolisthesis was an arthritic degenerative condition (Ex. 551-1 and
Ex. 551-3) that, together with her pre-existing stenosis, explained Plaintiff's ongoing
lower back and extremity pain; (2) that Plaintiff had a pre-existing facet cyst at L4-5
(Ex. 532-2A and Ex. 532-3A); or (3) that Plaintiff had repeatedly reported significant
back pain to her physicians, including lower back pain and pain that was radiating
down her back and legs, since at least 2014, and that this pain had worsened over time
because of progressive degeneration, not an accident (see supra ¶¶ 109-118).

110.   Therefore, the Court finds Dr. Rudin's opinion that the fall did not
exacerbate these conditions more persuasive and more credible than Plaintiff's expert
Dr. Nourian's contrary opinion is. Dr. Rudin reviewed all available evidence, while

Dr. Nourian did not. And the CT scan and MRI images show that Plaintiff's spondylolisthesis stabilized before the fall, and did not get worse afterwards. Dr. Nourian opined that a fall *could* exacerbate the condition by causing pain that does not register on imaging. Assuming arguendo that this is true, the evidence does not establish by a preponderance that the fall exacerbated Plaintiff's pre-existing conditions.

## V.   CONCLUSIONS OF LAW RELATING TO DAMAGES

### A. Legal Standard

111.   "[A] person injured by another's tortious conduct is entitled to recover the reasonable value of medical care and services reasonably required and attributable to the tort." *Hanif v. Housing Authority of Yolo County* 200Cal.App.3d 635, 640 (1988).

111.   Regardless, if Defendant is successful in showing that it is more likely than not that Plaintiff had pre-existing conditions, Plaintiff may recover to the full extent that [her] condition has worsened as a result of defendant's tortious act. Sa*nchez v. Kern Emergency Medical Transportation Corp.* 8 Cal.App.5th 146, 168 (2017). "The tortfeasor takes the person he injures as he finds him. If, by reason of some preexisting condition, his victim is more susceptible to injury, the tortfeasor is not thereby exonerated from liability." *Rideau v. Los Angeles Transit Lines* 124 Cal.App.2d 466, 471 (1954).

112.   "It has long been the rule that a tortfeasor responsible for the original accident is also liable for injuries or death occurring during the course of medical treatment to treat injuries suffered in that accident. In *Ash v. Mortensen* 24 Cal.2d654 (1944) the Supreme Court stated: 'It is settled that where one who has suffered personal injuries by reason of the tortious act of another exercises due care in securing the services of a doctor and his injuries are aggravated by the negligence of such doctor, the law regards the act of the original wrongdoer as a proximate cause of the

1  damages flowing from the subsequent negligent medical treatment and holds him

2  liable therefor.'" *Anaya v. Superior Court*  78 Cal.App.4th 971, 974 (2000).

3       113.   "[N]oneconomic damages do not consist of only emotional distress and

4  pain and suffering. They also consist of such items as invasion of a person's bodily

5  integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired

6  enjoyment of life, susceptibility to future harm or injury, and a shortened life

7  expectancy." (Bigler-Engler v. Breg, Inc. (2017) 7 Cal.App.5th 276, 300.)

8       **B. Plaintiff's Damages**

9       114.   The Court finds, as the parties agree, that Plaintiff's April 24, 2021 fall

10  caused compression fractures of Plaintiff's L2 and L1 vertebrae. Plaintiff is entitled to

11  damages arising from these injuries.

12       115.   The Court also finds that Plaintiff has <u>not</u> proven by a preponderance of

13  the evidence that her pre-existing spondylolisthesis, stenosis, and facet cyst were

14  worsened or exacerbated by the fall. Therefore, Plaintiff is not entitled to damages

15  arising from these conditions.

16       116.   The reasonable value of Plaintiff's past medical treatment for the L2 and

17  L1 fractures is $22,721.96.

18       117.   The Court also awards non-economic damages of $114,900 as follows:

19            a.  $15,000 for pain, emotional distress, bodily invasion/disfigurement

20                for each of the two kyphoplasties = $30,000

21            b.  $300 per day for pain, suffering, emotional distress, embarrassment,

22                loss of enjoyment for 283 days (from the April 24, 2021 fall until

23                February 1, 2022, at which point Plaintiff was healed) = $84,900

24       118.   Plaintiff's total damages are: $22,721.96 + $114,900 = $137,621.96

25  Considering the parties' comparative fault, Defendant is liable for 20% of Plaintiff's

26  damages, which is $27,524.40.

27

28

The parties are **<u>ORDERED</u>** to met and confer and to jointly file a Proposed Judgment as soon as possible, but no later than 5 days after the issuance of this Order.

**IT IS SO ORDERED.**

Dated: January 04, 2024

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE